Peter C. GROPP III, Arnold D. Pilkington, Rick Q. Dacosta, John P. Hlavacek, and William P. O'Brien, Plaintiffs,

v.

UNITED AIRLINES, INC., a corporation, and Air Line Pilots Association, International, Defendants.

No. 92–1032–Civ–T–17B.

United States District Court, M.D. Florida, Tampa Division.

April 13, 1993.

James J. Cusack, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, FL, for plaintiffs.

Peter Wolfson Zinober, Zinober & McCrea, Tampa, FL, Tom Jerman, O'Melve-

ny & Myers, Los Angeles, CA, for United Airlines.

Kevin Christopher Ambler, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Tampa, FL, Babette A. Ceccotti, Cohen, Weiss & Simon, New York City, for Air Line Pilots Ass'n, Intern.

## ORDER ADOPTING REPORT AND RECOMMENDATION

KOVACHEVICH, District Judge.

Plaintiffs, Peter C. Gropp III, Arnold D. Pilkington, Rick Q. Dacosta, John P. Hlavacek, and William P. O'Brien filed an Amended Motion for Preliminary Injunction (Docket No. 12) on August 11, 1992, in which they petition this Court to enjoin Defendants, Air Line Pilots Association, International ("ALPA") and United Airlines, Inc. ("United") from implementing certain allegedly discriminatory actions. This Court, under authority of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Rule 6.02, Local Rules of the Middle District of Florida, referred the motion to the Honorable Thomas G. Wilson, United States Magistrate Judge, by Order of Referral dated July 29, 1992 (Docket No. 6).

After considering the parties' submissions and oral arguments[1], Judge Wilson, on August 28, 1992, filed a Report and Recommendation ("R & R") (Docket No. 25) wherein he recommends that this Court deny Plaintiff's motion. Judge Wilson determined, first, that Plaintiffs are not likely to succeed on the merits of their claim and, secondly, that Plaintiffs have not demonstrated that they will be irreparably harmed if injunctive relief is not granted. On September 25, 1992,

Plaintiffs filed their Objections to Magistrate's Report and Recommendation (Docket No. 28) ("Plaintiff's Objections").[2] After reviewing Judge Wilson's findings in light of Plaintiff's objections, this Court adopts the Magistrate Judge's report and recommendation.

## I. BACKGROUND[3]

Plaintiff pilots were recruited by United in preparation for an impending strike by ALPA pilots in the Spring of 1985. On May 17, 1985, ALPA struck United and Plaintiffs went to work as "fleet-qualified pilots." A "fleet-qualified pilot" is a pilot who is already qualified to fly aircraft in United's fleet and can begin flying soon after being hired. Plaintiffs continued to be employed by United after the strike was settled in June, 1985, and held valid domicile rights to Miami.[4]

In August of 1991, United decided to close its B-727 based Miami domicile. Subsequently in October, 1991, United gave ALPA official notice of the closing. As a result of closing the Miami domicile, ALPA, through the Master Executive Council ("MEC"), negotiated additional benefits for the pilots who were affected by this closing. In a letter of agreement (the "Agreement") dated December 9, 1991, United and ALPA agreed that any pilot that had transferred out of Miami after January 1, 1990, would be "grandfathered" into any Florida domicile opened by United before January 31, 1997. All of the Plaintiffs transferred out of the Miami domicile after January 1, 1990, but before ALPA was notified of the closing.

In 1992, after obtaining Pan-American World Airways, Inc.'s ("Pan Am") Latin

---

1. Although the Magistrate Judge heard oral testimony in regards to this motion, the parties did not provide this Court with a written transcript, nor was it cited in the responses to the report and recommendation. Therefore, this Court did not review the testimony.

2. Rule 72(b), Federal Rules of Civil Procedure states that within ten days after being served with a copy of the recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations. Both parties moved for and received extensions to the ten day deadline. Subsequently, on October 23, 1992, both ALPA and United filed

responses to Plaintiff's objections (Docket Nos. 32 and 33, respectively).

3. Although this Court adopts the Magistrate Judge's report and recommendation, a summary of the facts and issues in this case is presented for the benefit of the reader. They are not intended to replace, modify, or supplement the findings of the report and recommendation.

4. Although each of the plaintiffs held rights to Miami, they each were bidding flight assignments out of different domiciles when United announced the closing of the Miami domicile. Plaintiffs still maintain homes in the Miami area.

American routes, United decided to re-open the Miami domicile for B–747 type aircraft. Positions on the B–747 aircraft have higher pay rates than positions on other type aircraft such as the B–727. Acting under the Agreement, United notified the Plaintiffs of their "grandfather" rights which would have allowed them to bid back into Miami. Since the B–747 positions are highly desired, other United pilots, not subject to the Agreement, complained to ALPA. As result of this pressure, ALPA, through MEC, began negotiations with United with the intent to ameliorate the Agreement's impact. On June 15, 1992, a revised letter (the "Revised Letter") was distributed under which the "grandfather" rights were limited to pilots that were actually forced to leave Miami after October 31, 1991 (the date of notification). The Revised Letter excluded Plaintiffs from the group of pilots who were granted "grandfather" rights under the Agreement.

Plaintiffs claim that, as a result of intentional discrimination by ALPA, they are being denied contractual rights to be based in Miami. Plaintiffs, through their motion for preliminary injunction, seek to: (1) enjoin ALPA and United from executing, acquiescing in, or implementing the Agreement under the Revised Letter, (2) enjoin ALPA from continuing to allegedly breach its duty of fair representation owed to the Plaintiffs under the Railway Labor Act, and (3) enjoin United from allegedly colluding with ALPA in degradation of ALPA's duty of fair representation.

## II. REVIEW OF REPORT AND RECOMMENDATION

This Court must first determine the standard to be applied in reviewing the Magistrate Judge's findings of fact and law. Under the appropriate standard, this Court must then review; (1) the law the Magistrate Judge followed in recommending to grant or deny the motion for preliminary injunction, (2) the law the Magistrate Judge followed which forms the basis of the cause of action, and (3) the Magistrate Judge's findings in light of the plaintiff's objections.

### A. *Standard of Review.*

Under the Federal Magistrate's Act (the "Act"), Congress vested Article III judges with the power to authorize a United States Magistrate Judge to conduct evidentiary hearings. The relevant portion of this act is found at 28 U.S.C. § 636. A district court judge may designate a United States Magistrate Judge to conduct hearings, including evidentiary hearings, in order to submit proposed findings of fact and recommendations (ie. R & R) for the disposition of motions for injunctive relief. 28 U.S.C. § 636(b)(1)(B). Within ten days after being served with a copy of the R & R, any party may file written objections to the proposed findings and recommendations. *Id.* Section 636(b)(1) also states that a judge of the court shall make a *de novo* determination of those portions of the R & R to which objection is made. 28 U.S.C. § 636(b)(1).

In *U.S. v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), the Court upheld the constitutionality of this provision of the Act. The Court found that Congress adequately protected the Act against an Article III constitutional challenge by subjecting the Magistrate Judge's proposed findings and recommendations to a *de novo* determination by the judge, who then exercises ultimate authority to issue an appropriate order. 447 U.S. at 681, 100 S.Ct. at 2415. In *Jeffrey S. v. State Board of Education of State of Georgia*, 896 F.2d 507, 512 (11th Cir.1990), the court stated that the *de novo* review requirement is essential to the constitutionality of section 636. The court further stated that section 636(b)(1)'s nonconsensual reference is saved from constitutional infirmity by the retention in the Article III judge of the ultimate adjudicatory power, to be exercised after assistance from and upon the recommendation of the Magistrate Judge. *Id.* at 512–13 (citing *Hall v. Sharpe*, 812 F.2d 644, 647 (11th Cir.1987)). Accordingly, the *de novo* review is based in a realization that only the district court judge can constitutionally dispose of a matter such as that in the instant case.

Rule 72 of the Federal Rules of Civil Procedure places into practice the powers codi-

fied in 28 U.S.C. § 636(b)(1).[5] Rule 72 follows the statutory example and sets forth different provisions for the two types of pretrial matters that can be referred to a Magistrate Judge. The first provision under § 636(b)(1)(A) states in part that a judge may designate a Magistrate Judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief. Rule 72(a) refers to the type a pretrial matter set out in § 636(b)(1)(A) as one that is not dispositive of a claim or defense.

The second provision, under § 636(b)(1)(B), states in part that a judge may designate a Magistrate Judge to conduct hearings, including evidentiary hearings, and to submit proposed findings of fact and recommendations (ie. R & R) for disposition, by a judge, of any motion excepted in subparagraph (A). Thus, subparagraph (B) applies to injunctive relief. Subparagraph (B) also allows any party, within 10 days, to file written objections to such proposed findings and recommendations. Additionally, § 636(b)(1) states that a judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.

Rule 72(b) describes those matters that are excepted in § 636(b)(1)(A) as ones that are dispositive of a claim or defense. Since injunctive relief is excepted from § 636(b)(1)(A), it is dispositive and a R & R submitted by a Magistrate Judge is subject to *de novo* review by the district judge. This part of Rule 72 also reiterates the need for a timely objection and a *de novo* determination upon the record. Thus, the Magistrate Judge's R & R in the instant case is reviewed *de novo* by the district judge who must then accept it, reject it, or modify it, in whole or in part.

The issue of whether the same *de novo* standard of review is applicable has been

addressed by courts in the Eleventh Circuit. In *LoConte v. Dugger,* 847 F.2d 745 (11th Cir.1988), the court addressed the issue of what standard of review the appellate court would use in reviewing the district court's adoption of a Magistrate Judge's R & R. In do so, the court examined what standard of review the district court was required to use in its review. The court in *LoConte* found that there are three different categories of findings reviewable on appeal: (1) findings of fact made by the Magistrate Judge to which the parties did not object; (2) findings of fact made by the Magistrate Judge to which the parties did object with the objections being resolved *de novo* by the district court; and (3) independent findings of fact made by the district court. *Id.* at 749. In reference to the findings stated in category (2), the *LoConte* court also stated that:

> Whenever any party files a timely and specific objection to a finding of fact by a magistrate, the district court has an obligation to conduct a de novo review of the record with respect to that factual issue. (citations omitted) As the use of the phrase de novo implies, the district court's consideration of the factual issue must be independent and based upon the record before the court.... [T]he factual conclusions reached by the district court are subject only to a "clearly erroneous" standard of review on appeal.

*Id.* at 750; *See also Jeffrey S. v. State Board of Education of State of Georgia,* 896 F.2d 507, 513 (11th Cir.1990), *Mannings v. School Board of Hillsborough County, Florida,* 796 F.Supp. 1491, 1492 (M.D.Fla.1992), *McHenry v. The Florida Bar,* 808 F.Supp. 1543, 1544 (M.D.Fla.1992).[6] It is clear that findings by the Magistrate Judge, to which the parties have made timely objections, are subject to *de novo* review by the district court judge.

■ The standard of review applicable under categories (1) and (3), supra, are differ-

**5.** See also, Rule 6.02, Local Rules of the United States District Court, Middle District of Florida.

**6.** In *Mohammed v. Chevron U.S.A. Inc.,* 738 F.Supp. 1383, 1385 (M.D.Fla.1990), the district court stated that "[a]fter objection, the findings of the Magistrate are entitled to be adopted unless they are found to be clearly erroneous."

However, in headnote [1], which precedes the reported opinion, the word "after" is changed to the word "absent." Given this conflict, and since the court in *Mohammed* did not cite to any authority contrary, it is assumed that the *Mohammed* case stands for the proposition reflected in the headnote.

ent from the *de novo* review standard of category (2). When no objections are made to the Magistrate Judge's R & R, the case law seems to indicate that the district court should review the findings using the same clearly erroneous standard of review that an appellate court must use when reviewing the district court's findings.

In *Nettles v. Wainwright,* 677 F.2d 404, 409 (5th Cir. Unit B 1982) (en banc), the court stated that if no objections are filed, the judge may accept, reject, or modify, in whole or in part, the findings and recommendations. The *Nettles* court further states that it is arguable that, when no objections are filed, the parties have accepted the Magistrate Judge's report and have consented to the recommendations. *Id.* In *Jeffrey,* the court stated that on appeal there is little practical distinction between the plain error standard of review applicable to unchallenged findings of fact by a Magistrate Judge and the clearly erroneous standard of review relevant to fact findings by the district court. 896 F.2d at 513, citing *LoConte,* 847 F.2d at 750. Although this Court finds no cases that explicitly state the clearly erroneous standard applies to non-objected to findings by the Magistrate Judge, or additional findings by the district court judge, this Court holds that to be the standard of review.

### B. *Preliminary Injunction.*

■ Under the federal court's traditional equity doctrine, it may issue an injunction in order to preserve the status quo. *See Collum v. Edwards,* 578 F.2d 110, 113 (5th Cir.1978). Preservation of the status quo enables the court to render a meaningful decision on the merits. *United States v. Lambert,* 695 F.2d 536, 540 (11th Cir.1983); *See also Flight Engineer's International Association v. American Airlines, Inc.,* 303 F.2d 5 (5th Cir.1962). As stated in 11 Wright & Miller, *Federal Practice and Procedure:* Civil § 2948, pp. 463–464, it has often been observed that the purpose of the preliminary injunction is the preservation of the status quo and that an injunction would not issue if it would disturb the status quo.

However, preservation of the status quo is not the only concern of the court. A court can order an injunction if the plaintiff can establish: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest. *United States v. Alabama,* 791 F.2d 1450, 1459 n. 10 (11th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987); *Johnson v. U.S. Dept. of Agriculture,* 734 F.2d 774, 781 (11th Cir.1984); *United States v. Jefferson County,* 720 F.2d 1511, 1519–1520 n. 21 (11th Cir.1983); *Canal Authority of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

In this case, the Magistrate Judge found: (1) that the Plaintiffs have not shown a likelihood of success on the merits, (2) that the Plaintiffs have not demonstrated that they will suffer irreparable harm if a preliminary injunction is not granted, and (3) that the Plaintiffs, by their motion for preliminary injunction, are not seeking to maintain the status quo, but to change it.

### C. *Duty of Fair Representation.*

■ The duty of fair representation is a judicially created duty imposed on unions under their statutory authority to serve as the exclusive bargaining representative. *See Steele v. Louisville & Nashville Railroad Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). This duty has been found where a union created seniority rights in a collective bargaining agreement. *See Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). The union's "statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion in complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967).

Thus, a union breaches its duty of fair representation "when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad

faith." 386 U.S. at 190, 87 S.Ct. at 916; *See also Del Casal v. Eastern Airlines, Inc.*, 634 F.2d 295 (5th Cir. Unit B), *cert. denied*, 454 U.S. 892, 102 S.Ct. 386, 70 L.Ed.2d 206 (1981). Finally, in *Air Line Pilots Association, International v. O'Neill*, 499 U.S. 65, ——, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51 (1991), the Supreme Court held that "the tripartite standard announced in *Vaca v. Sipes* applies to a union in its negotiating capacity." Therefore, ALPA owed a duty of fair representation to the Plaintiffs when it negotiated an interpretation of the Agreement.

### D. *Plaintiff's Objections.*

■ The Plaintiffs have alleged that ALPA breach its duty of fair representation though discrimination. The Plaintiffs have applied to this Court to enjoin both ALPA and United from implementing the provisions in the Revised Letter agreement. The Magistrate Judge issued a report and recommendation in which he recommends that this Court find that Plaintiffs have not met their burden to show that a preliminary injunction be issued.

Pursuant to Rule 72(b), Plaintiffs have filed timely objections to eight of the Magistrate Judge's findings of fact. The Court has reviewed each objection, along with the Magistrate Judge's findings. Below are the findings to which objections have been filed and a summary [7] of the review:

1. "Seniority is the sole basis for position assignments at United." (R & R, p. 2; Plaintiff's Objections, p. 1.)

This Court agrees with the Magistrate Judge's finding that seniority is the sole basis for position assignments at United. Plaintiffs argue that bumping, base closures, mergers, and acquisitions also provide the opportunity for positions to be awarded out of normal seniority. However, within these special categories, as in the instant case, seniority is still used as the sole basis for position assignments. The more senior grandfathered pilots have priority over the other grandfathered pilots. This distinction

is supported in the Magistrate Judge's findings.

2. "As of January 1990, the plaintiffs were domiciled in Miami as B–727 second officer. By May 1991, all had transferred out of Miami to positions as first officers or, in one case, as international relief pilot." (R & R, pp. 2–3; Plaintiff's Objections, p. 2.)

Plaintiffs argument that they bid out of Miami voluntarily or due to a desire to be promoted is of no relevance to the issue at hand. First, as defendants point out in their memorandum, the requirement that a pilot must serve 12 months as a first officer before bidding for a captain's position was not a product of the Agreement. Furthermore, the pilots desire to attain a captain's position is also irrelevant in regards to their "grandfather" rights. The Agreement allowed any pilot subject to the "grandfather" rights to bid back into Miami at any position that pilot's seniority would achieve against other "grandfathered" pilots. A pilot bidding into the reopened Miami domicile could bid for such positions as a second officer, first officer, or even captain. The Magistrate Judge's findings in this regard are correct and supported by the evidence.

3. "As a result [of the announcement of the opening of the Miami domicile and the implementation of the December 9, 1991, grandfather rights], at the beginning of June 1992, United sent a letter to the pilots that had been previously based in Miami, stating that any pilot that had been domiciled in Miami since January 1, 1990, had grandfather rights to return to Florida and that those rights could be lost if not appropriately exercised. This letter caused complaints by a number of pilots.... ALPA, as a result, sought modifications in the December 9, 1991, agreement. After negotiations, the parties executed a revised agreement dated June 15, 1992.... [T]he modifications in the June 15, 1992, agreement had nothing to do with ALPA's attitude toward the fleet-quali-

---

7. The summaries are put forth as further explanation of the findings in light of Plaintiffs' objections. This court, though this order, is adopting the Magistrate Judge's recommendation without modification.

fied pilots. Rather, the modifications were designed to ameliorate a substantial windfall that would accrue to former Miami-based pilots, regardless of whether they were fleet qualified pilots." (R & R, pp. 3–4, 7; Plaintiff's Objections, p. 3.)

The purpose of the Revised Letter was to prevent a windfall to those pilots, fleet qualified or not, who left Miami prior to its announced closing. Plaintiffs transferred, for whatever reason, without any actual knowledge that they would receive grandfather rights back into a Miami domicile sometime in the future. Plaintiffs received the rights after they had transferred to other domiciles. Once the Miami domicile was reopened, the windfall was effectuated, not created.

Contrary to Plaintiffs argument, the windfall was not created by the placement of the Pan Am pilots at the bottom of the seniority list. The fact that the Pan Am pilots are placed below Plaintiffs did not change the "grandfathered" position that Plaintiffs were placed in as a result of the Agreement. The Pan Am pilots were ranked after the Agreement was negotiated.

Under the Agreement, the "grandfathered" pilot must bid back into Miami into a position that is equal to or better in status than the one currently held. If the pilot did not bid, the right was lost regardless of whether the pilot's seniority was sufficient to obtain the position over other "grandfathered" pilots.

The Magistrate Judge's findings concerning this objection are supported by the evidence. Additionally, the Magistrate Judge correctly considered and ruled out the suggestion that the Revised Agreement was a result of any improper animus. Although there is evidence of union animus, there is no evidence that the Revised Letter was negotiated with discriminatory motivation.

5.[8] "As a result of the Miami domicile reopening as a B–747 domicile, the grandfather rights to return to Miami would give pilots with these rights an opportunity to obtain, over pilots with more seniority, a premier position with the airline." (R & R, p. 7; Plaintiff's Objections, p. 5.)

Absent the Agreement, all United pilots could have bid into the reopened Miami domicile based on their seniority. Under the Agreement, those pilots subject to it have the right to bid ahead of other more senior non-"grandfathered" pilots for the positions that were lost when the domicile closed.

Plaintiffs argue that the seniority rights of all pilots were extinguished when the domicile was closed and that they were granted the option to return when it reopened. However, as the Magistrate Judge correctly found, the positions which became available when the domicile reopened were different than those that were lost. Therefore, these positions were not the subject of the Agreement and the Revised Letter reflected an attempt by the union to limit this potential windfall to those who were bumped. As a result of the closure of the Miami domicile, the "grandfathered" pilots were granted a benefit, to the exclusion of all other pilots, including those who transferred prior to the announcement.

6. "There were 97 pilots who qualified for grandfather rights under United's interpretation of the December 9, 1991, agreement, but only 90 of those were actively working (Doc. 18 at p. 7). Of the 90, 43 pilots lost grandfather rights under the June 15, 1992, agreement (id.). Only eight of the 43 were fleet-qualified pilots (id.). Since 35 of the pilots who lost grandfather rights were not fleet-qualified pilots, it is unreasonable to infer that ALPA sought modification of the grandfather rights in order to discriminate against fleet-qualified pilots. This is supported further by the fact that six fleet-qualified pilots retained their grandfather rights after the modification (id.). Moreover, two of those actually benefitted from the decrease in the number of pilots with

8. There is no "Objection No. 4" in Plaintiffs' objections to the Magistrate Judge's report and recommendation.

grandfather rights (*id.* at p. 8)." (R & R, p. 8; Plaintiff's Objections, pp. 5–6.)

The above statistics are supported by the evidence contained in the record. Plaintiffs do not refute the above cited direct evidence. Their argument that they are the only five pilots that have not been able to return to Miami is unsupported in the record. Furthermore, the fact that there were six fleet-qualified pilots that were not affected by the Revised Letter is further proof that the plaintiffs were only affected because they transferred out of Miami prior to the announced closing of the domicile.

The statistics are direct evidence that ALPA acted rationally when it negotiated the interpretation stated in the Revised Letter. ALPA, in *O'Neill, supra,* settled a strike with another airline and agreed to a modified seniority bidding agreement which allowed for the striking pilots to be reinstated. The Supreme Court in *O'Neill,* found that the actions of ALPA in that case were rational. 499 U.S. at ——, 111 S.Ct. at 1137. "A rational compromise on the initial allocation of the positions was not invidious 'discrimination' of the kind prohibited by the duty of fair representation." *Id.* ALPA, in the instant case, negotiated an interpretation of the Agreement which allowed for benefits to be extended to those pilots who were bumped and, at the same time, prevented an allocation of premier positions to those pilots who left the Miami domicile prior to its closing.

7. "An ALPA affiant, who is himself a pilot, states that 'It is not unusual for a pilot's domicile and his or her residence to be in different geographic locations' (Doc. 15 at p. 3). That is reflected in the plaintiff's own circumstances." (R & R, p. 12; Plaintiff's Objections, p. 7.)

The fact that Plaintiffs left Miami before the Agreement was negotiated is evidence indicating that they were not harmed by the Revised Agreement. If the Miami domicile was not reopened, the pilots would still have to commute. The evidence shows, and Plaintiffs concur, that it is common for pilots to live in a city other than their domicile. Plaintiffs contend that it is unusual that a pilot lives in a domicile city other than the one in which the pilot is based. The fact that the pilots transferred out of Miami is evidence directly contrary to this contention.

8. "Significantly, the plaintiffs, by their motion for preliminary injunction, are not seeking to maintain the status quo, but to change it." (R & R, p. 12; Plaintiff's Objections, p. 7.)

Plaintiffs argue that the status quo is that which existed prior to ALPA's alleged discrimination. However, as stated in paragraph 19 of the Declaration of Rob Salt in Opposition to Motion for Preliminary Injunction, filed August 12, 1992 (Docket No. 18), only Plaintiff Peter C. Gropp was denied a B–747 first officer position in Miami as a result of the lack of "grandfather" rights. However, all Plaintiffs could have attained a first officer position on the B–767 in Miami and thus return to Miami where their homes are located. Since the pilots were not prevented from returning to Miami, the status quo will not be preserved by the issuance of a preliminary injunction.

9. "Furthermore, United's affidavit casts great doubt upon the strength of the plaintiffs' desire to return to Miami. That affidavit states that in July, 1992 all plaintiffs could have bid into their First Officer positions on B–767's in Miami (Doc. 18, p. 11). Their failure to do so indicates that a delay in returning to a Miami domicile would, at most, be a matter of personal inconvenience, and not irreparable injury." (R & R, pp. 12–13; Plaintiff's Objections, p. 8.)

In addressing the irreparable harm issue, the Magistrate Judge found that Plaintiffs failed to bid back into Miami as First Officers. Three of the plaintiffs, in their objection, indicate that they could not logically bid to fly as B–767 First Officers since their status of B–737–300 Captain had an 18-month freeze in equipment. Furthermore, Plaintiffs, in their Memorandum in Support of Plaintiffs' Amended Motion for Preliminary Injunction, filed August 11, 1992 (Docket No. 13), make no arguments that any successful bid without "grandfather" rights would have resulted in a reduction in pay. These assertions are unsupported in the record and therefore do not contradict the Magistrate Judge's findings.

## III. CONCLUSION

The Magistrate Judge's report and recommendation is supported in the record. Therefore, it is:

**ORDERED** that the report and recommendation, dated August 28, 1992, be **ADOPTED;** the motion for preliminary injunction be **DENIED.**

**DONE AND ORDERED.**